## UNITED STATES v. LESSER et al.
### No. 487.

Circuit Court of Appeals, Second Circuit.
Aug. 1, 1933.

Morris Kamber, of New York City (Otho S. Bowling, of New York City, of counsel), for appellant Henry Lesser.

Anthony P. Savarese, of Jamaica, L. I. N. Y., for appellant Forrest E. James.

Alfred D. Van Buren, of New York City, for appellant Philip M. Lahn.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y. (Herbert H. Kellogg, Donald C. Strachan, and Emanuel Bublick, Asst. U. S. Attys., all of Brooklyn, N. Y., of counsel), for the United States.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Henry Lesser, Forrest E. James, Philip M. Lahn, Walter E. Anderson, and Henry Henners were indicted for conspiring to violate section 2 of the Federal Food and Drugs Act of June 30, 1906 (21 USCA § 2). The indictment against Anderson was dismissed, and the jury found Henners was not guilty. Lesser, James, and Lahn were convicted and have all appealed.

The indictment alleged that the defend-

ants conspired to "introduce, ship and deliver for shipment from one State to another State adulterated and misbranded foods and drugs" and to "sell, transport, deliver and introduce, ship and deliver for shipment from one State to another State, a large quantity of fluid extract of ginger * * * which was then and there adulterated in that it differed from the standard strength, quality and purity of fluid extract of ginger as determined by the tests laid down in the United States Pharmacopœia. * * *" The indictment also alleged that the defendants were doing business under the fictitious names of Jordan Brothers, S. A. Hall, and Charles M. Pomeroy, and that the conspiracy continued from June 1, 1929, to February 1, 1932.

Section 2 of the Food and Drugs Act (21 USCA § 2) makes any person guilty of a misdemeanor who shall ship or deliver for shipment from any state to any other state "any article of food or drugs which is adulterated or misbranded, within the meaning of sections 1 to 15. * * *" The term "drug" is defined in the act as including "all medicines and preparations recognized in the United States Pharmacopœia or National Formulary for internal or external use." Section 7, 21 USCA. In section 8, 21 USCA, a drug is defined as adulterated if, when it "is sold under or by a name recognized in the United States Pharmacopœia or National Formulary, it differs from the standard of strength, quality, or purity, as determined by the test laid down in the United States Pharmacopœia or National Formulary official at the time of investigation." But it is provided that no drug shall be deemed to be adulterated "if the standard of strength, quality, or purity be plainly stated upon the bottle, box, or other container thereof although the standard may differ from that determined by the test laid down in the United States Pharmacopœia or National Formulary."

We think that the government introduced evidence at the trial which justified the jury in finding that there was such a conspiracy as the indictment alleged and that all three of the defendants-appellants participated in it.

The defendant Lesser was interested in a flavoring and fruit extract business, having its headquarters at 601 Bergen street, Brooklyn, N. Y., known as the Fulton Chemical Works. It manufactured and supplied fluid extract of ginger and various fruit extracts to customers in many parts of the United States, among others, California Extract Company, Los Angeles, Cal., of which Jacob Rosenbloom, the half-brother of Lesser, was the owner, K. & K. Drug Company, of Newport, Ky., owned by Sol Kauffman, Leo B. Dreyfoos, of Cincinnati, Ohio, and Prescott B. Burkett, who did business under the name of Valo Products Company, Kansas City, Lone Star Company, Dallas, Tex., and American Products Company, Kansas City. From the year 1925 on, Rosenbloom's concern purchased Jamaica ginger extract from the Fulton Chemical Works and in the latter part of 1930 and early part of 1931. Lesser went west to see his half-brother in the latter part of 1929. Just before Rosenbloom ceased to do business in the early part of 1931, the sales were made to him in the names of Jordan Brothers and S. A. Hall. The evidence identified the latter with Fulton Chemical Works. Some of the ginger shipped in the name of Jordan Brothers was found upon a chemical examination to have been adulterated.

Sol Kauffman conducted business under the name of K. & K. Drug Company. He began doing business with the Fulton Chemical Works of 601 Bergen street about 1925 and 1926, and met James, Lesser, Lahn, and Henners at that place. He did business with the same concern in 1929 and the early part of 1930, when he ceased doing business. Fluid extract of ginger was sent to him under invoices of Fulton Chemical Works, Decker Ingraham & Smith, J. Carboy, and S. A. Hall, and he made his checks payable to the order of the person or concern named in the invoice. The orders, however, were given to the Fulton Chemical Works. An invoice dated February 13, 1930, was in the name of S. A. Hall. Kauffman discussed with Lesser the business of fruit extracts and extract of ginger and the prices of goods he had ordered from the Fulton Chemical Works (fol. 1713) during the latter part of the year 1929 when Lesser was in Cincinnati on business. Kauffman said that Lesser was connected with Fulton Chemical Works in 1929 and early in 1930 (fol. 1926).

Dreyfoos, of Cincinnati, testified that he purchased fluid extract of ginger from Lesser, James, and Lahn in 1927, 1928, 1929, and up to the latter part of February, 1930; that he would give orders to Lesser, James or Lahn and, when he sent in written ones, would send them to 601 Bergen street, Brooklyn, the office of the Fulton Chemical Works. Merchandise would be shipped in the names of this company and of S. A. Hall and J. Carboy, and the check would be made out to the person named in the invoice, but the orders would be given to Fulton Chemical Works.

614

Lesser and James were at the Gibson Hotel in Cincinnati in the early part of 1930.

Preston D. Burkett testified that he had had business relations with Lesser, James, and Lahn. He admitted making purchases from Lesser as the Fulton Chemical Works in 1924. He refused to disclose what they were on the ground that to answer might tend to incriminate him, but denied that he purchased extract of ginger from them in 1929 or 1930. On the same ground he refused to say whether he purchased it from S. A. Hall or Jordan Brothers in 1929 or 1930, and likewise refused to say whether he had any correspondence with James in 1929 and 1930. It was, however, shown by another witness named Darnell that he and Burkett, under the name of Valo Products, purchased adulterated ginger extract in 1930 and 1931 from Jordan Brothers and Pomeroy. There was evidence showing those persons were identified with Fulton Chemical Works.

Various other witnesses testified to dealings with Lesser in connection with the Fulton Chemical Works but at dates prior to 1929.

We think that the foregoing proof was sufficient to justify a jury in finding that Lesser continued in the business of the Fulton Chemical Works and of the individuals and concerns allied with it in the sale of fluid extract of ginger in interstate commerce. He offered no proof of severance from the association with the Fulton Chemical Works which had once existed and had continued for years. Though the earliest shipment of adulterated and misbranded fluid extract of ginger established was of the date of December 4, 1930, and the latest connection of Lesser with the conspiracy specifically shown was in February, 1930, it may reasonably be inferred that his proved relation continued in the absence of any evidence to the contrary. The "presumption of continuance," so called, justified the jury in believing that Lesser remained connected with Fulton Chemical Works throughout the period of the conspiracy during which the illegal shipments which were pleaded occurred. Commonwealth v. Fragassa, 278 Pa. 1, 122 A. 88; Easterday v. United States, 53 App. D. C. 387, 292 F. 664; Paterson v. Mobile Steel Co., 202 Ala. 471, 80 So. 855; Cooper & Peabody v. Dedrick, 22 Barb. (N. Y.) 516.

The so-called "Jim" letters written by the defendant James to Preston D. Burkett not only show the connection of James with the conspiracy, but greatly re-enforce the case against Lesser. Exhibit 153, which is apparently dated January 15, 1931, says that Harry "suggested that you destroy all your records as understand they want to try and subpœna them for the cases which are coming up." In Exhibit 155, which is under date of March 24, 1931, is the statement:

"Harry did not see his party Sat. but he talked to him by phone and was told not to worry. Have not heard from the Coast since I wrote to you last. They were supposed to be on trial yesterday in some small town and surely hope they come out O. K. If only they can smooth that thing out there is still some hope that the business will come back somewhere near normal and if it does we all will have to try our 'darndest' to keep it clean."

It is to be noted that prior to March 24, 1931, there had been a shipment of fluid extract of ginger in the name of Jordan Brothers to the California Extract Company which was found by the analysis of the chemists to be poisonous.

In Exhibit 157, under date of March 28, 1931, we find the following:

"Haven't heard a word from California so we have been unable to even guess what happened Monday. * * * Certainly will be glad when that matter is adjusted and naturally hope that they go no further than fines, and that they do not put an embargo on future shipments. * * *

"Oh, well, why worry, they may have us down but so far we are not out and to use Harry's pet expression, 'everything will be all right in the morning.'"

In Exhibit 161, under date of May 27, the writer says:

"Have been unable to make shipment of your two barrels because we have been out of merchandise and have been after Harry for 10 days to get some in, but he is so dizzy that I don't know what is going to happen. If I don't get something definite from him within a day or two I will go out myself and get some goods and see that your order is filled. He seems to think that the racket is about over and wants to close up shop and quit. * * * *"

On May 29 (Exhibit 162), James writes that:

"Harry and I haven't gotten together regarding the future but I did not want to hold you up any longer so went ahead and handled everything myself. He is coming in Monday and we will then decide definitely whether we continue or whether he drops out and I carry along alone for awhile."

In Exhibit 163, dated June 5, 1931, James writes:

"Had another long chat with Harry today at lunch and he thoroughly understands now that I am going ahead alone and try and get the four samples approved. * * *

"Hated like the devil to break away from Harry because he certainly has been a wonderful friend but he has other things on his mind and did not want to follow along on my proposition so I just must follow along by myself. * * * "

In Exhibit 164, dated June 11, 1931, James writes about a mistake in the last shipment and says:

"Sorry about this but Harry had me going around in circles while he was trying to make up his mind what to do. When he finally decided to step out I rushed too fast and was depending on memory, hence the error."

To this exhibit is appended a financial statement dated June 11, 1931, showing a payment on August 1, 1930, to H. L. of $1,153.80. "Harry" and "H. L." were evidently the defendant Lesser. The foregoing letters show that the defendant Lesser was closely identified with James in the shipments to California and to the companies with which P. D. Burkett was connected and that this relation continued until June, 1931.

It is perhaps unnecessary to refer to other evidence than the "Jim" letters to show the participation of James in the conspiracy, but there was much other proof connecting him with the sales in interstate commerce of the Fulton Chemical Works and its adjuvants. Kauffman testified that he had had dealings with James as well as with Lesser and Lahn at the Fulton Chemical Works, that he did business with that concern in 1929 and 1930 and placed orders with it for fluid extract of ginger and received deliveries upon those orders, invoiced under the names of Fulton Chemical Works, S. A. Hall, Decker Ingraham & Smith, and J. Carboy. His conversations regarding the payment of the invoices were with James. James stayed with Lahn and Lesser at the Hotel Gibson in Cincinnati in 1929, and was there with Lesser in 1930. Dreyfoos likewise had conversations there with James and Lahn about fruit extracts and prices of merchandise. The insurance firm, of which James was a member, paid the rent of Jordan Brothers at No. 360 Furman street, Brooklyn, whence shipments in the name of Jordan Brothers were made. A dealer in essential oils, named Bolz, took orders from James on October 25, 1930, and at times

thereafter. In January, 1931, this dealer received an order from Jordan Brothers. When they tendered their check for the purchase price, Bolz refused to accept it without some assurance that it was good. He was thereupon referred by Jordan Brothers to James, who telephoned that their check was all right. Proof connecting James with the conspiracy was ample.

The evidence also established the participation of the defendant Lahn in the conspiracy. He was the bookkeeper of Fulton Chemical Works. He took orders for it from persons purchasing extracts, ordered letterheads printed both for it and for S. A. Hall, Decker Ingraham & Smith, and J. Carboy, and also ordered supplies of essential oils, including oleo resin of ginger. He directed the mail of S. A. Hall to be forwarded from No. 598 Atlantic avenue to 186 Joralemon street, care of James, and rented an office at 598 Atlantic avenue under the fictitious name of Slade. A check used to pay the Schwartz Laboratories for an analysis on March 4, 1931, for James, of fluid extract of ginger, and found to contain phenols of a harmful nature, was charged to the account of Lahn.

It is evident from the above that Lesser, James, and Lahn were all associated in the business of Fulton Chemical Works and its various instrumentalities and were all engaged in shipping fluid extract of ginger in interstate commerce.

■ Various shipments of ginger fluid extract were made in interstate commerce in the names of Jordan Brothers, S. A. Hall, and Charles M. Pomeroy, which, upon analysis, were found to be adulterated and to differ from the "standard of strength, quality, or purity" of fluid extract of ginger as "determined by the test laid down in the United States Pharmacopœia." Food and Drugs Act § 7 (21 USCA § 8). It is argued for the appellants that no "test" is laid down in the Pharmacopœia to determine the character of fluid extract of ginger and that consequently the act is not shown to have been violated. But the Pharmacopœia sets forth how a fluid extract of ginger is to be compounded, and the statute penalizes any person guilty of adulterating or misbranding. U. S. Pharmacopœia 10th Revision 1926, pp. 158, 159, and 175. To interpret the words "test laid down" as referring to a method of detecting nonconformity with the standard of the Pharmacopœia is to give the words an unnecessarily narrow meaning. They require conformity with the standard set up in the Pharmacopœia and make no attempt to prescribe a method of

ascertaining whether such conformity exists. The chemist Eaton testified that he subjected the California shipments to chemical tests and found that they contained more oil and less ginger solids than a normal product of fluid extract of ginger. He also found that they contained an "organic phosphorous compound of the type tricresyl phosphate," which is a poisonous ingredient, and were not the fluid extract of the United States Pharmacopœia. He said that the way to ascertain whether fluid extract of ginger complies with the United States Pharmacopœia is to make a ginger extract according to its teachings and then determine the various ingredients "like the solids, and the ash, and the phosphorous compound * * * and the alcohol," and find out "what they run on an average."

The testimony of the chemist Reznek was to the same effect. The testimony of the chemist Maurice E. Smith related to specimens taken from shipments to California Extract Company and to Burkett's companies. He said that preparations purporting to be fluid extract of ginger contained a triorthocresyl phosphate, which was a poisonous ingredient. He tested the effect of the material upon chickens and the result of administering it was a partial paralysis, known to be caused by the presence of triorthocresyl phosphates. The basis for a finding by the jury that the shipments were adulterated and did not meet the standard of the United States Pharmacopœia was ample.

There can be no doubt that enough was proved to justify an inference of guilty knowledge. The shipments failed to conform to lawful standards and were made in many cases by persons or concerns from whom they were not directly ordered. Lahn directed the post office to forward to James the mail of S. A. Hall, in whose name some of the shipments were made, and Lahn himself used the fictitious name of Slade when he rented an office at 598 Atlantic avenue for Hall. The "Jim" letters show that James and Lesser were aware of the illegality of the enterprise, and that Lesser abandoned it about June, 1931, after the shipments to California had come under investigation and danger was imminent. We think it evident that the business was conducted in a surreptitious way, and are satisfied that there was proof of guilty knowledge on the part of the appellants.

It is argued that the indictment should have been dismissed at the opening. It is said that the allegation that the defendants conspired to "unlawfully introduce, ship and deliver for shipment from one state to another state adulterated and misbranded foods and drugs" having been made in the conjunctive, a conspiracy to ship food as well as drugs had to be shown, and that the specification of fluid extract of ginger as the subject-matter of the conspiracy makes it impossible to prove the broad allegation as to both food and drugs. But the allegation as to adulterated foods may be disregarded as surplusage where, as here, the indictment sufficiently states a crime conspiring to ship adulterated drugs.

The contention that the indictment should have been dismissed for duplicity because it alleged generally a conspiracy to ship adulterated foods and drugs is trivial. As it specifies that the shipments to be made were of fluid extract of ginger there is in fact no duplicity. But in no event could the defendant be prejudiced by the inclusion of "foods" in the allegation. It is said that in case of an acquittal under this indictment where the only proof related to shipments of fluid extract of ginger, which is a drug, the defendants might still be subject to a new indictment for conspiring to ship adulterated foods. But it is well established that in case of a second prosecution resort may be had to parol evidence to establish the crime of which a defendant has in fact been convicted and that the sufficiency of a plea in bar must be tested in that way. Bartell v. United States, 227 U. S. 433, 33 S. Ct. 383, 57 L. Ed. 583.

It is also argued that error was committed by the trial court in allowing the government's pharmacological expert Maurice I. Smith to testify about his experiments on chickens with the samples of the extracts shipped by the defendants and to show that the administration of the ingredients produced paralysis. Proof of the poisonous effect of the compounds shipped tended to fortify the chemical testimony that they were adulterated and contained tricresyl phosphate, which is known to produce a paralyzing effect. There is no reason to hold that the noncorrespondence of the extracts shipped with the standard of the Pharmacopœia must only be shown by chemical analyses. On the contrary, it may be established in any other logical and convincing way. Goodwin v. United States (C. C. A.) 2 F.(2d) 200; Columbus Const. Co. v. Crane Co. (C. C. A.) 98 F. 946, at page 957.

Judgment affirmed.