UNITED STATES of America

v.

**MORTON–NORWICH PRODUCTS, INC.,** a corporation, trading and doing business as Norwich Pharmacal Company, and James J. Mahoney, Defendants.

No. 75–CR–114.

United States District Court,
N. D. New York.

Aug. 15, 1978.

Paul V. French, U.S. Atty., Syracuse, N.Y., Thomas S. Brett, Arthur E. Korkosz, U.S. Dept. of Justice, Washington, D.C., Eric M. Blumberg, United States Food & Drug Administration, Washington, D.C., for plaintiff.

Davis, Polk & Wardwell, S. Hazard Gillespie, Paul R. Koepff, Scott W. Muller, Virginia H. Worden, New York City, of counsel, Kleinfeld, Kaplan & Becker, Richard S. Morey, Washington, D.C., of counsel, for defendant Morton-Norwich Products, Inc.

Bernard J. Schulte, Santo J. Costa, Norwich, N.Y., In-House Counsel for Norwich Pharmacal Co.

Paul R. Shanahan, Syracuse, N.Y., for defendant James J. Mahoney.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

This is a criminal action involving three alleged violations of the Federal Food, Drug and Cosmetic Act, Title 21 U.S.C. §§ 301, et seq. Named as defendants in the Indictment are Morton-Norwich Products, Inc., a corporation doing business as Norwich Pharmacal Company, and James J. Mahoney, Vice-President of Operations for Morton-Norwich Products, Inc.

Indictment Number 75–CR–114, which was handed up on or about September 30, 1975, alleges three violations by both defendants of the Food, Drug and Cosmetic Act, all of which violations involve the interstate shipment of adulterated drugs, in contravention of sections 301(a) and 303 of the Act, 21 U.S.C. §§ 331(a) and 333 respectively. Each count, in turn, alleges adulteration in two separate and distinct senses, one falling within section 501(c), 21 U.S.C. § 351(c),[1] in that the purity of the drugs involved differed from that purported, the other coming under section 501(a)(2)(B), 21 U.S.C. § 351(a)(2)(B),[2] contending that the drugs were not manufactured, processed, packaged or held in conformity with current good manufacturing practice so as to

---

1. 21 U.S.C. § 351 provides:

 A drug or device shall be deemed to be adulterated—

 \* \* \* \* \* \*

 Misrepresentation of strength, etc., where drug is unrecognized in compendium

 (c) If it is not subject to the provisions of subsection (b) of this section and its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess.

 \* \* \* \* \* \*

2. Under 21 U.S.C. § 351(a)(2)(B), a drug or device is deemed to be adulterated

 (B) if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess;

assure that they would conform to the Food, Drug and Cosmetic Act requirements as to safety, and would have the strength and identity and meet the quality and purity characteristics which they purported to possess (The (a)(2)(B) violation will be referred to simply as CGMP).

The products involved in the three counts of the Indictment are two lots, numbered 705553 (Counts I and II) and 710749 (Count III), of individually packaged gauze pads impregnated with Furacin (trade name for nitrofurazone), an antibacterial dressing. All of the products involved were manufactured at the defendants' sterile fill facility located in Norwich, New York.

The gravamen of the charge of adulteration under 21 U.S.C. § 351(c) is that the pads, purported to be sterile according to the labeling found on the foil envelopes in which the pads were to be marketed, were not, in fact, sterile. The charge under 21 U.S.C. § 351(a)(2)(B) relates to several alleged violations of CGMPs, based heavily upon observations made during Food and Drug Administration (FDA) inspections of the defendants' sterile fill facility at Norwich, as well as the actual evidence of product contamination.

This Court conducted a rather lengthy nonjury trial of this action, commencing on January 13, 1977, and ending on March 18, 1977. Following the trial, the Court reserved decision on the verdict. Since none of the parties requested that the Court make special findings, the general verdict was announced to the parties in open court. See Fed.R.Crim.P. Rule 23(c). To recapitulate, the Court found defendant Morton-Norwich guilty on Counts I and II and not guilty on Count III, and acquitted defendant Mahoney on all three charges.

Prior to, during, and after the trial, the parties made numerous motions, upon many of which the Court reserved decision. This supplemental Opinion is being rendered in order to deal with those motions, and to hopefully clarify the verdict somewhat for the benefit of the parties.

## I. MOTION TO STRIKE GOVERNMENT'S TEST RESULTS

Throughout this proceeding, the defendants have attacked, on three grounds, the introduction into evidence of the results of tests performed by FDA analysts on post-shipment specimens of product taken from the two lots in issue. First, they claim that owing to the fact that a sterility test such as involved in this case is necessarily destructive of the product unit tested, and because sterility in a manufacturing situation cannot be guaranteed on an absolute basis, sterility is necessarily a probabilistic concept. The defendants have insisted that their representation of sterility was proper in this case as long as pre-shipment tests, validly conducted by them in accordance with the methods prescribed by the United States Pharmacopoeia (U.S.P.),[3] indicated sterility, despite the fact that later tests revealed the presence of contamination in one or more samples of previously untested product. Secondly, the defendants attack the relevance of post-shipment tests with respect to the issue of sterility at the time of shipment. Finally, the defendants have sought to impeach the results of the Government's tests, pointing to several deviations of the methods used from that prescribed by the U.S.P.

### A. Defendants' Representation of Sterility

▮ In support of their position on this score, the defendants, through various expert witnesses, have proffered definitions of the term "sterility" or "sterile," all of which reject the notion of sterility as being an absolute concept in favor of a definition dependent upon results of probabilistic testing performed upon random samples of the product in accordance with U.S.P. testing methods. Thus, the argument goes, an article is properly labeled as "sterile" if it has passed pre-shipment sterility tests per-

---

**3.** The U.S.P. is recognized under the Federal Food, Drug and Cosmetic Act as an official compendium. See 21 U.S.C. § 321(j).

formed pursuant to the U.S.P. method, notwithstanding the fact that some untested product units are in fact contaminated.

The Court rejects the notion that the term "sterile," as contained within the labeling which accompanies the defendants' product, is susceptible of such a narrow interpretation. This Court is of the opinion that the meaning to be ascribed to labeling which accompanies a product is, like beauty, properly in the eyes of the beholder, rather than the manufacturer. Cf. *United States v. Article . . . Consist. of 216 Carton. Bot.,* 409 F.2d 734 (2d Cir. 1969).[4] A customer who utilizes defendants' furacin gauze or batiste pads, whether he be a doctor, a nurse, or a layman, in this Court's estimation, will interpret the representation of sterility to mean the total lack of contamination of the product. To allow the defendants to avoid liability under the Act merely by testing samples of the product, which samples prove negative for contamination, would be to obliterate the standard of absolute liability imposed by the Food, Drug and Cosmetic Act, see *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88

L.Ed. 48 (1943), and subtly inject into the statute an element of scienter, or conscious awareness of guilt. The Court believes that the relevant inquiry under 21 U.S.C. § 351(c) is whether or not the gauze and batiste pads contained in Lots 705553 and 710749 were, in fact, sterile when shipped, utilizing an absolute definition of sterility.[5]

The defendants' motion to exclude the Government's test results upon this basis is accordingly denied.

### B. Relevance of Post-Shipment Testing

The clear import of 21 U.S.C. § 331(a) is that in order to prove a violation of that provision, adulteration *at the time the product entered, or was delivered for introduction into, interstate commerce* must be proven beyond a reasonable doubt. *Penobscot Poultry Co. v. United States,* 244 F.2d 94 (1st Cir. 1957). Adulteration, of course, may be demonstrated by any logical and convincing means. *United States v. Lesser,* 66 F.2d 612 (2d Cir. 1933); cf. Fed. Rules of Ev.Rules 402, 702. One manner of proving pre-shipment adulteration is by showing adulteration after receipt at some point in time subsequent to travel in inter-

---

4. While that case dealt with misbranding under 21 U.S.C. §§ 352(a) and 352(e)(1)(A)(ii), it can be properly analogized to a situation of alleged adulteration under 21 U.S.C. § 351(c).

5. Admittedly, such a result is difficult, if not impossible, to achieve under normal manufacturing conditions. This is indicative, nevertheless, of the extremely heavy burden which Congress sought to impose upon the manufacturers of products falling within the ambit of the Food, Drug and Cosmetic Act. For example, a food which contains any filthy, putrid or decomposed substance (albeit completely harmless), as do virtually all foods, is deemed adulterated under 21 U.S.C. § 342(a)(3), and is accordingly in violation of the Act when shipped in interstate commerce. *United States v. 484 Bags, More or Less,* 423 F.2d 839 (5th Cir. 1970); *United States v. 1,200 Cans, Pasteurized Whole Eggs, Etc.,* 339 F.Supp. 131 (N.D.Ga. 1972).

The courts have somewhat ameliorated the hardships resulting from such a literal application of the Act by utilizing a *de minimis* doctrine to forgive minor, technical violations shown to be unavoidable even through the use of good manufacturing practice. See *United States v. 1,500 Cases More or Less, Etc.,* 236

F.2d 208 (7th Cir. 1956); *United States v. 449 Cases, Containing Tomato Paste,* 212 F.2d 567 (2d Cir. 1954). The Court need not decide whether such a doctrine should apply to cases of drug adulteration under 21 U.S.C. § 351(c), inasmuch as the contamination discovered in Lot 705553, *which respect to which the defendants were found guilty, cannot be considered as de minimis.*

The FDA has also taken steps to reduce the hardships associated with literal interpretation of the Act by exercising its prerogative under 21 U.S.C. § 336 to decline prosecution for minor violations, and by establishing tolerances, or Defect Action Levels (DALs), below which level of adulteration no FDA action would take place. See *United States v. 484 Bags, More or Less, supra*; see also *Dean Rubber Manufacturing Company v. United States,* 356 F.2d 161 (8th Cir. 1966). There is no evidence, however, of a DAL having been established with respect to sterility of gauze or batiste pads represented to be sterile, nor would the Court be bound by such a DAL were one to exist. *United States v. 484 Bags, More or Less, supra* at 842; *United States v. 449 Cases, Containing Tomato Paste, supra* at 575.

state commerce, together with proof that the adulteration necessarily occurred prior to shipment, rather than some later time. *Pasadena Research Laboratories v. United States,* 169 F.2d 375 (9th Cir. 1948), cert. den. 335 U.S. 853, 69 S.Ct. 83, 93 L.Ed. 401 (1948).

The Court believes that the Government has sufficiently demonstrated that the post-shipment tests performed upon samples of their product are highly probative with regard to the issue of pre-shipment sterility. The defendants' motion to exclude those test results upon this basis is therefore denied.

### C. Reliability of FDA Tests

The defendants have drawn into issue the reliability of the FDA analysts' test results, pointing to various deviations of the methodology utilized from that prescribed by the U.S.P.

■■ In proving adulteration under 21 U.S.C. § 351(c), the Government is not limited to any particular manner of proof, and is especially not limited to use of tests conducted in accordance with the U.S.P. *Woodard Laboratories v. United States,* 198 F.2d 995 (9th Cir. 1952). This Court has had ample opportunity to hear testimony from FDA analysts who performed the various post-shipment tests upon the products in issue. The Court was similarly able to view those analysts' test worksheets and to listen to numerous expert witnesses' opinions with regard to the validity of those tests. As must be obvious from the verdict, the Court has concluded that the tests conducted upon samples from Lot 705553 were valid, especially with regard to demonstrating pre-shipment contamination, and that the Government has proven pre-shipment adulteration of that lot beyond a reasonable doubt.[6]

A separate but related motion was made by the defendants to exclude certain of the Government's sterility test results (Government Exhibits 63, 64, and 78), based upon the Government's failure to preserve and produce records relating to the preparation and sterilization, by autoclaving, of the culture media utilized in the testing (T. 443–444; 780–783; 2407–2410; 2495).

The Court is of the opinion that this deficiency relates not to the admissibility *vel non* of those test results, but merely to the weight to be accorded to them. In light of the use by the FDA analysts of both positive and negative controls, all of which produced results indicative of satisfactory testing conditions, the Court determines that the results of the tests are accurate and relevant and therefore should not be excluded.

■ The defendants have also challenged the testimony of Leonard Mastrandrea, the FDA Laboratory Supervisor for the Brooklyn facility, as a portion of their attack upon the Government's test results. In particular, they contend that Mr. Mastrandrea's testimony as to lack of positive results in open controls on tests in which fleakers were used was hearsay, and should therefore be stricken (T. 3261–3264). The Court is of the opinion that, with proof that all instances of positive results in those open controls would be reported to Mr. Mastrandrea, evidence of the absence of such reports is not hearsay, is highly relevant, and should therefore be admitted. See McCormick on Evidence § 250 (2d Ed. 1972).

### II. MOTION TO STRIKE TESTIMONY RELATING TO SPECIATION OF THE MOLD

■ The defendants have moved to exclude testimony of Dr. Mislivic, an FDA

---

**6.** It seems only fair that, inasmuch as the FDA is seeking to hold the defendants to such a high standard of conduct, it should likewise insist on a high standard of conduct from its own employees. The Court is referring, in part, to the apparently common practice of certain FDA analysts of photocopying portions of test worksheets for later use in other tests. Compare, e.

g. Government Exhibits 10, p. 2 with 54, p. 2, and 43, p. 3 with 63, p. 3 (See also T. 611–615). Also cited *infra* as an example of some departure from such a standard is the testimony given before the Grand Jury by one of the FDA inspectors (See T. 1909–1913; see also 1935–1938; 1966–1987; 1990–2022; 3423).

mycologist who testified on behalf of the Government concerning his speciation of the molds cultured by the several FDA analysts during their testing of samples from defendants' Lot 705553 (T. 2412–2417; 2495; 3424). The defendants have also moved to strike testimony of Government expert witnesses, which testimony was based in part upon the speciations performed by Dr. Mislivic. The basis of their objection in this regard is Dr. Mislivic's failure to preserve the specimens from which he identified the presence of the mold *paecilomyces varioti*, which they claim effectively deprived them of their right to confront and cross-examine Dr. Mislivic, one of the Government's crucial witnesses.

While the Court believes that the better practice would have been for Dr. Mislivic to preserve, in some manner, the samples actually speciated, whether by photograph or by maintaining the sample itself, especially since litigation was, at that point, virtually inevitable, the Court does not believe that his failure to do so rendered the results of those speciations inadmissible. Rather, it should merely affect the weight to be accorded to the results of his speciations. The defendants' motion in this regard is accordingly denied.

## III. MOTION TO DISMISS BASED UPON ALLEGEDLY FALSE GRAND JURY TESTIMONY

The allegations set forth by the defendants in support of their motion to dismiss, based upon the prosecution's purported knowing use of perjured testimony before the Grand Jury in order to secure the instant Indictment, center around the testimony of Donald Howard. Mr. Howard was the FDA inspector whose observations during an inspection of defendants' Norwich sterile fill facility during June of 1973 form the core of the FDA's case concerning CGMP violations (T. 1935–1938; 1966–1987; 1990–2022; 3423). During his testimony before the Grand Jury, Mr. Howard characterized defendants' Norwich sterile fill facility as being in substantial violation of the CGMPs in June of 1973. He failed to men-

tion to the Grand Jury, however, that he had inspected that same facility in February of 1973, and reported no major CGMP violations at that time. In fact, his testimony was such that the Grand Jury could reasonably have believed that the June inspection was Howard's first visit to the defendants' Norwich plant.

This Court is indeed somewhat troubled with this aspect of Mr. Howard's testimony before the Grand Jury. That witness's characterizations of the Norwich facility as being in substantial violation of CGMPs are somewhat misleading when taken in context with the fact of his previous visit during which he failed to report any substantial violations.

This Court has read the Grand Jury minutes of this case *in camera,* however, and is convinced that the Indictment is not vitiated by Mr. Howard's testimony. As should be obvious by now, the Court's verdict in this case with respect to Counts I and II was primarily the result of a finding of adulteration as defined in 21 U.S.C. § 351(c), rather than any CGMP violation under 21 U.S.C. § 351(a)(2)(B). On this score, there was ample evidence before the Grand Jury, quite independent of Mr. Howard's testimony, to support the charges lodged in the Indictment. As such, the defendants' motion to dismiss based upon this ground is denied. *United States v. DeLeo,* 422 F.2d 487 (1st Cir. 1970), cert. den. 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *Coppedge v. United States,* 114 U.S.App.D.C. 79, 311 F.2d 128 (1962) (Burger, J.).

## IV. MOTION TO EXCLUDE CERTAIN OBSERVATIONS

The defendants challenge the introduction, as evidence of CGMP violations, of various observations made at the Norwich sterile facility outside of the time frame during which the lots in issue were manufactured (e. g. T. 1603–1605; 2395; 2396–2400). While the Court has indicated that its verdict rests upon finding actual contamination, in violation of 21 U.S.C. § 351(c), rather than a CGMP violation un-

der 21 U.S.C. § 351(a)(2)(B), it nevertheless feels compelled to briefly address this point.

 The Court is in agreement that, with respect to CGMP violations, the evidence must relate to conditions as they existed at the time applicable to the Indictment; that is, the time of manufacture of the lots in question. In proving its case, however, the Government should not be limited to use of testimony of observations actually made during the critical time period. Rather, it is proper to consider proof of conditions existing at times reasonably close to those in issue, providing that the Government can demonstrate that, by virtue of the nature of the conditions and the closeness in time, it is reasonable to infer that the same conditions occurred during the critical time period. *United States v. 1,200 Cans, Pasteurized Whole Eggs, Etc.,* 339 F.Supp. 131 (N.D.Ga.1972). For example, while it is reasonable to assume that the physical layout of defendants' sterile facility was, for the most part, the same in June of 1973 as it was earlier that year, it is not necessarily proper to infer, without more, that because a wooden-handled tool was present in the sterile fill area in June, that it was also there in February. Likewise, while observations of many insects present in the fill room in June might be relevant as indicative of a continuing CGMP violation for improper insect-proofing, the mere presence of a single fly on one or more occasions cannot be used to infer the presence of insects at other times.

Because the verdict as to Counts I and II was based upon actual adulteration rather than CGMP violations, and because the Court finds insufficient evidence of CGMP violations even considering all of the evidence now under challenge, it is unnecessary to rule upon the defendants' various objections falling within this category.[7]

## V. CONCLUSION

In closing, the Court would like to express its deep appreciation to all of the lawyers who worked so diligently in preparing and presenting this case. The amount of time and effort which went into preparation of the case on both sides was apparent to this Court. The parties' efforts succeeded in enlightening the Court with regard to a rather complex and technical subject matter.

The verdict stands as previously announced in court. The various motions upon which the Court reserved decision at different stages in the proceedings are resolved in accordance with the foregoing Opinion.

It is so ordered.

---

**7.** The same holds true with respect to Government's Exhibit 106, a report of observations made by Richard Kilgore during an inspection of June, 1973.