**UNITED STATES of America**
v.
**OCEAN PERCH FILLETS** (four cases).
**Nos. 6–177, 6–187, 6–188, 6–189.**

United States District Court
D. Maine, S. D.
June 30, 1961.

Peter Mills, U. S. Atty., Portland, Me., for plaintiff.

Samuel Hoar, Jr., Paul F. Schlaikjer, Boston, Mass., Henry M. Fuller, Portsmouth, N. H., for defendant.

GIGNOUX, District Judge.

These are four libels of information filed by the United States of America pursuant to the provisions of Section 334(a) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq. (hereinafter "the Act"), seeking condemnation of five lots of frozen Ocean Perch fish fillets processed and packed by the claimant, 40-Fathom Fisheries, Inc., at its fish plant at Rockland, Maine.

The libel in Civil No. 6–177 was originally filed in this Court. It seeks condemnation of a lot of 129 cases, more or less, packed by claimant under its "40-Fathom" label, and a lot of 89 cases, more or less, packed by claimant under its "Port-O-Rockland" label, both of which were seized while in the cold storage room in claimant's fish plant at Rockland, Maine. The libels in Civil Nos. 6–187, 6–188 and 6–189 were originally filed in the United States District Court for the District of Massachusetts. The libels in Civil No. 6–187 and Civil No. 6–188 respectively seek condemnation of a lot of 388 cases, more or less, and a lot of 518 cases, more or less, both of which were packed by claimant under its "Port-O-Rockland" label and were seized while in the cold storage warehouse of Granite City Cold Storage, Inc., Quincy, Massachusetts. The libel in Civil No. 6–189 seeks condemnation of a lot of 2,975 cases, more or less, packed by claimant under a "Birds Eye" label, which was seized while in the cold storage warehouse of Quincy Market Cold Storage and Warehouse Company, Watertown, Massachusetts.

All four libels charge that the lots of frozen fish fillets involved were adulterated when introduced into or while in interstate commerce, or while held for sale after shipment in interstate commerce, within the meaning of Section 342(a) (3) of the Act in that they consisted in whole or in part of a decomposed substance by reason of the presence therein of decomposed fish fillets. The claimant has answered each libel admitting the shipment in interstate commerce but denying the allegation with respect to adulteration.

Upon application of the claimant pursuant to the provisions of Section 334(b) of the Act, the four libels were consolidated for trial in this Court, as involving the same claimant and the same issues of adulteration. At the pre-trial conference it was stipulated that there were no controverted issues other than the issue of adulteration, and the four cases, as consolidated, were set for trial by the Court, without a jury.

Upon the basis of the stipulations and evidence presented by the parties during an eight-day trial, the Court now makes its findings of fact and conclusions of law, separately in each action, as follows:

## I

### Civil No. 6–177

### Findings of Fact

1. On December 19 and 20, 1960 at its fish plant at Rockland, Maine, the claimant unloaded from one of its trawlers, the F/V Storm, approximately 308,000 pounds of Ocean Perch (sometimes known as red fish or rose fish), which had been caught on the Grand Banks, off Newfoundland, in the waters of the Atlantic Ocean outside the territorial limits of the State of Maine and the United States. The F/V Storm departed Rockland for the trip upon which these fish

were caught on November 30, 1960 and returned to Rockland on December 19, 1960. The first of the fish were caught on December 4, and the last of the fish were caught on December 14. All of the frozen fillets involved in this action were cut from the fish caught on this trip.

2. On December 19, 20 and 21, 1960 approximately 293,500 pounds of the fish unloaded from the F/V Storm as described in paragraph 1 were filleted and packed in cartons of either 12 ounces or 5 pounds each, hard frozen, placed in cases containing either 10 5-pound cartons or 12 12-ounce cartons each, and stored in the cold storage room in claimant's fish plant at Rockland.

3. The fish and fillets involved in this action were handled in accordance with claimant's usual practice, which is as follows:

All trawlers used by claimant for catching Ocean Perch are owned and operated by claimant, are refrigerated, and are cleaned prior to each trip. As fish are caught, they are placed in bins in the hold of the trawler and are covered with ice to help preserve them for the balance of the trip. The average trip to the Grand Banks lasts less than 20 days.

Upon return of a trawler to claimant's Rockland fish plant, the fish are immediately unloaded under the constant observation of claimant's "back shop" foreman, whose sole task is to check the fish for freshness and quality. The best fish are classified as Class 1 and are packed as claimant's best quality brands, of which its "Port-O-Rockland" brand is one. Older fish are classified as Class 2 and are separately processed and packed as claimant's second quality brands, of which its "40-Fathom" brand is one. Under-sized fish are classified as "culls" and are separately processed and packed under claimant's lowest quality brand, which is called "Sea Fresh". Rotten or bad fish are classified as "gurry". Gurry is not processed, but is sold for fish meal.

There are three processing and packaging lines in claimant's plant, each capable of handling 2,000 pounds of fish per hour. During the processing and packaging, the whole fish and fillets are under constant visual observation by claimant's foremen, who check for freshness and quality, and claimant's packing room foreman, who is also its quality control supervisor, withdraws 100 fillets each hour for organoleptic testing by smell. After cutting and "candling", the fillets are quick frozen, and either stored in the plant cold storage room or loaded in refrigerated trucks for shipment.

The quality control measures employed by claimant, both in the operation of its trawlers and in the processing and packing of the fillets in its plant, are above average for the Ocean Perch industry.

4. Approximately 16,000 pounds of the fish unloaded from the trip of the F/V Storm described in paragraph 1 were rejected by claimant as "gurry", and approximately 25,000 pounds were classified by claimant as Class 2 fish. A normal amount of "culls" was packed under claimant's "Sea Fresh" label.[0] The "Port-O-Rockland" lot here involved was packed from Class 1 fish; the "40-Fathom" lot here involved was packed from Class 2 fish.

5. On January 5, 1961 an Inspector of the Federal Food and Drug Administration randomly selected for testing 1 5-pound package from each of 10 cases from a lot of 129 cases, more or less, each case containing 10 5-pound packages of fillets, packed by claimant on December 20, 1960 under its "40-Fathom" label, and similarly selected for testing 1 5-pound package from each of 10 cases from a lot of 89 cases, more or less, each case containing 10 5-pound packages of fillets, packed by claimant on December 20, 1960 under its "Port-O-Rockland"

---

**0.** On January 16, 1961 a Food and Drug Administration Inspector at Carnegie, Pa., selected samples from a lot of 500 cases, more or less, packed by claimant from this fish under its "Sea Fresh" label. Organoleptic examination by smell of 1145 fillets so obtained showed 72 (6.3%) Class 2 fillets and 7 (.6%) Class 3 fillets. Condemnation proceedings were not instituted against this lot.

label. These are the two lots of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lots of which they were a part.

6. On January 6, 1961 organoleptic examination by smell was made of these samples by qualified Food and Drug Administration analysts at the Food and Drug Administration Laboratory in Boston, Massachusetts, with the following results:

"40-Fathom" Label

Total Number of Fillets
Examined:                    569

| Number of Class 1 fillets | 470 | (82.6%) |
| " " " 2 " | 32 | ( 5.6%)[1] |
| " " " 3 " | 67 | (11.8%) |

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    583

| Number of Class 1 fillets | 521 | (89.4%) |
| " " " 2 " | 25 | ( 4.3%) |
| " " " 3 " | 37 | ( 6.3%) |

7. The results of organoleptic examinations by smell of pre-seizure samples randomly selected from the two lots of frozen fillets involved in this action, which were offered in evidence by claimant, were as follows:

(1) "Class 3 Origin Inspection" by United States Air Force Veterinarian Service Food Inspector, December 20, 1960 (routine inspection during processing conducted preparatory to acceptance of "Port-O-Rockland" lot for United States Army):

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    327
(6 5-pound packages)

| Number of Class 1 fillets | 321 | (98.2%) |
| " " " 2 " | 6 | ( 1.8%) |
| " " " 3 " | 0 | |

(2) Second examination of "Port-O-Rockland" lot by same inspector, January 16, 1961 (conducted to check his earlier findings):

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    227
(4 5-pound packages)

| Number of Class 1 fillets | 220 | (97%) |
| " " " 2 " | 7 | ( 3%) |
| " " " 3 " | 0 | |

(3) Examination by claimant's personnel, January 12, 1961:

"40-Fathom" Label

Total Number of Fillets
Examined:                    120
(2 5-pound packages)

| Number of Class 1 fillets | 118 | (98.3%) |
| " " " 2 " | 2 | ( 1.7%) |
| " " " 3 " | 0 | |

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    120
(2 5-pound packages)

| Number of Class 1 fillets | 119 | (99.2%) |
| " " " 2 " | 1 | ( .8%) |
| " " " 3 " | 0 | |

(4) Examination by Birds Eye representative, February 7, 1961 (at request of claimant):

"40-Fathom" Label

Total Number of Fillets
Examined:                    257
(5 5-pound packages)

| Number of Class 1 fillets | 235 | (91.5%) |
| " " " 2 " | 22 | ( 8.5%) |
| " " " 3 " | 0 | |

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    382
(7 5-pound packages)

| Number of Class 1 fillets | 341 | (89.3%) |
| " " " 2 " | 41 | (10.7%) |
| " " " 3 " | 0 | |

1. All percentages in these findings are by number, and not by weight.

(5) Examination by claimant's personnel, February 10, 1961:

"Port-O-Rockland" Label

Total Number of Fillets
Examined: 180

(3 5-pound packages)

| Number of Class 1 fillets | 176 | (97.7%) |
| " " " 2 " | 4 | ( 2.3%) |
| " " " 3 " | 0 | |

Taste tests by the same personnel of the four No. 2 fillets revealed no disagreeable taste.

The packages selected as samples for the foregoing tests were representative of the quality and condition of the lots of which they were a part.

8. On February 17, 1961 the United States of America filed the libel of information in this action seeking condemnation of the two lots of frozen fillets here involved.

9. On March 10, 1961, pursuant to order of this Court issued under Section 334(c) of the Act, an Inspector of the Food and Drug Administration and a representative of claimant, in the presence of the United States Marshal, collected duplicate post-seizure samples for testing, each set of samples consisting of 1 5-pound package from each of 20 cases from each of the two lots of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lots of which they were a part.

10. On March 15 and 16, 1961 organoleptic examination by smell was made of the post-seizure samples selected by the Food and Drug Administration by qualified Food and Drug Administration analysts in the Food and Drug Administration Laboratory in Washington, D. C., with the following results:

"40-Fathom" Label

Total Number of Fillets
Examined: 1190

| Number of Class 1 fillets | 895 | (75.2%) |
| " " " 2 " | 152 | (12.8%) |
| " " " 3 " | 143 | (12.0%) |

"Port-O-Rockland" Label

Total Number of Fillets
Examined: 1163

| Number of Class 1 fillets | 871 | (74.9%) |
| " " " 2 " | 182 | (15.6%) |
| " " " 3 " | 110 | ( 9.5%) |

The analysts who conducted the foregoing tests in Washington were experienced analysts and leading authorities in the field of organoleptic examination of food products, especially frozen fish fillets.

11. On March 15 and 16, 1961 organoleptic examination by smell was made of the post-seizure samples selected by claimant by representatives of claimant in its plant at Rockland, Maine, with the following results:

"40-Fathom" Label

Total Number of Fillets
Examined: 1145

| Number of Class 1 fillets | 1118 | (97.7%) |
| " " " 2 " | 21 | ( 1.8%) |
| " " " 3 " | 6 | ( .5%) |

"Port-O-Rockland" Label

Total Number of Fillets
Examined: 1134

| Number of Class 1 fillets | 1109 | (97.8%) |
| " " " 2 " | 23 | ( 2.0%) |
| " " " 3 " | 2 | ( .2%) |

Taste tests by the same representatives of two of the Class 2 "Port-O-Rockland" fillets revealed no disagreeable taste.

The representatives who conducted the foregoing tests on behalf of claimant were its packing room foreman, who is also its quality control supervisor, and the representative of Birds Eye who had participated in the pre-seizure examinations at the request of claimant.

12. The aggregate results of the organoleptic examinations by smell conducted by the Food and Drug Administration analysts of both the pre-seizure and post-seizure samples as described in paragraphs 6 and 10 are as follows:

"40-Fathom" Label

Total Number of Fillets
Examined:                    1759

Number of Class 1 fillets    1365  (77.6%)
"       "       "   2   "     184  (10.5%)
"       "       "   3   "     210  (11.9%)

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    1746

Number of Class 1 fillets    1392  (79.7%)
"       "       "   2   "     207  (11.9%)
"       "       "   3   "     147  ( 8.4%)

13. The aggregate results of the organoleptic examinations by smell conducted by claimant of both the pre-seizure and post-seizure samples as described in paragraphs 7 and 11 are as follows:

"40-Fathom" Label

Total Number of Fillets
Examined:                    1522

Number of Class 1 fillets    1471  (96.6%)
"       "       "   2   "      45  ( 3.0%)
"       "       "   3   "       6  (  .4%)

"Port-O-Rockland" Label

Total Number of Fillets
Examined:                    2370

Number of Class 1 fillets    2286  (96.4%)
"       "       "   2   "      82  ( 3.5%)
"       "       "   3   "       2  ( 0.1%)

14. From the date of processing to the present time all of the frozen fillets involved in this action have been continuously in hard-frozen form, and their quality and condition as regards decomposition was the same at the time of the tests hereinabove described as it was when they were packed.

15. The organoleptic test by smell as used in this action by the Food and Drug Administration analysts and by the analysts presented by claimant was developed by the Food and Drug Administration some twenty years ago, and is accepted by the Food and Drug Administration and by the fish industry both as a reliable method and as the standard method for detecting the state of decomposition in frozen fish fillets, including frozen Ocean Perch fillets. It is conducted by thawing the hard frozen fillets in cold running water; removing the fillets from the water; weighing and counting the fillets; and then breaking open each fillet and smelling it with the nose closely in contact with the flesh.

The following classifications are utilized both by the Food and Drug Administration and by the fish industry in this test:

Class 1 fillets—No odor,[2] or a slight stale odor or a slight fishy odor which is characteristic of the species, but not offensive.

Class 2 fillets—A slight but distinct odor of decomposition, which may quickly dissipate on contact with air. The Food and Drug Administration analysts describe this odor as offensive; claimant's analysts describe it as a "gassy" odor, but not offensive.[3]

Class 3 fillets—A decidedly strong odor of decomposition. Both the Food and Drug Administration analysts and claimant's analysts describe this odor as definitely offensive. They also agree that the difference between the odor of decomposition in a Class 2 fillet and that in a Class 3 fillet is one of degree and not of kind.

Upon all the evidence in this action, in the evaluation of which the Court has been assisted by a demonstration,[4] the Court finds that although the Food and Drug Administration analysts and claim-

2. Although the Food and Drug Administration places a fillet having no odor in a separate Class 0, Class 0 was not utilized by it in this action.

3. Also included in Class 2 are other odors, such as bilge and freezer odors, which are not germane to this action. Insofar as the record reveals, none of the frozen fillets involved in this action had bilge or freezer odors.

4. At the instance of the Court, with the approval of the parties, a demonstration of an organoleptic test by smell was conducted at the close of all the evidence

ant's analysts tended to use different words to describe the odors identified by them as belonging in each of the foregoing classifications, in fact they were describing the same odors—that is to say, that all of the analysts who testified at the trial would classify almost every fillet with a given odor in the same class.

16. The Food and Drug Administration and the fish industry recognize that a Class 3 fillet is in an advanced state of decomposition, is offensive in smell and in taste, and is unfit for food, and the Court so finds. The Food and Drug Administration and the fish industry are in disagreement as to the state of decomposition of a Class 2 fillet and as to the offensiveness of its smell, but the Court deems it unnecessary, in view of its finding with respect to Class 3 fillets, to make any finding in this respect.

17. Upon all the evidence in this action, including primarily the results of the organoleptic tests hereinabove set forth, which have been evaluated after a consideration of the experience, qualifications and interest of the analysts who conducted them, the Court finds that each of the two lots of frozen fillets here involved contains in excess of 10% Class 2 fillets and in excess of 6% Class 3 fillets, which extend throughout the entire lot.

18. The percentage of Class 3 fillets in each of the two lots of frozen fillets here involved is substantially in excess of any administrative tolerance indicated in the record.

19. The results of the chemical tests of selected post-seizure samples conducted by the Food and Drug Administration and by claimant, while tending to correlate with the organoleptic classifica-tions of Class 2 fillets by the Food and Drug Administration, were inconclusive as to the existence or non-existence of Class 3 fillets because of the loss of chemical indices in the preparation of the Food and Drug Administration's samples for testing and because of the limited nature of claimant's tests, and the Court has therefore not taken these chemical tests into account in making the foregoing findings.

Conclusions of Law

1. This Court has jurisdiction of this action and of the parties hereto.

2. Each of the two lots of frozen Ocean Perch fillets involved in this action constitutes an article of food within the meaning of 21 U.S.C.A. § 334(a). A. O. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542; United States v. 43½ Gross Rubber Prophylactics, D.C. D.Minn.1946, 65 F.Supp. 534, affirmed *sub nom.* Gellman v. United States, 8 Cir., 1947, 159 F.2d 881; United States v. 935 Cases, etc., D.C.N.D.Ohio 1946, 65 F. Supp. 503, 504.

3. A Class 3 Ocean Perch fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3).

4. Each of the two lots of frozen Ocean Perch fillets involved in this action was adulterated when introduced into or while in interstate commerce, or while held for sale after shipment in interstate commerce, within the meaning of 21 U.S.C.A. § 342(a) (3) because it consisted in part of a decomposed substance by reason of the presence therein of in excess of 6% Class 3 fillets. Compare United States v. 1851 Cartons, etc., 10 Cir., 1945, 146 F.2d 760.

5. Each of the two lots of frozen Ocean Perch fillets involved in this action

at the Cafeteria of the Portland High School. Two analysts who had testified at the trial, one designated by each party, smelled and classified approximately 200 fillets from the lots here involved. Since the fillets were not representative samples of the fillets seized, the demonstration was for the sole purpose of assisting the Court in understanding and evaluating the evidence by observing how often the two analysts would place a given fillet in the same class, and by permitting the Court to observe and smell a few representative fillets. Of the 204 fillets examined, the Government's expert placed 25 in Class 2 and none in Class 3; the claimant's expert placed 27 in Class 2 and none in Class 3. There was no substantial disagreement between them.

is liable to seizure and condemnation by the United States of America pursuant to 21 U.S.C.A. § 334(a).

6. Because of the presence in each of the two lots of frozen Ocean Perch fillets involved in this action of more than 6% Class 3 fillets, it is unnecessary for the Court to consider: (1) whether 21 U.S.C.A. § 342(a) (3) admits of a *de minimis* exception, see United States v. 233 Tins, etc., D.C.W.D.Ark.1959, 175 F. Supp. 694, 702; (2) whether 21 U.S.C.A. § 342(a) (3) permits the Court to recognize an administrative tolerance of less than 6% Class 3 fillets, see United States v. 1500 Cases, etc., 7 Cir., 1956, 236 F.2d 208; (3) whether a Class 2 fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3) or whether the presence of Class 2 fillets is otherwise significant under that section; or (4) whether a food product which consists wholly or in part of a decomposed substance, but which is not unfit for food, is adulterated within the meaning of 21 U.S.C.A. § 342(a) (3), see United States v. 1500 Cases, etc., supra; United States v. 449 Cases, etc., 2 Cir., 1954, 212 F.2d 567, 45 A.L.R.2d 846 (majority and dissenting opinions).

The Court will render its final judgment in this action in a separate written decree of condemnation and forfeiture, which is to be prepared by the Government, approved as to form by the claimant, and submitted to the Court for its approval and signature within ten days from this date. After entry of the decree, the claimant may have the benefit of the provisions of 21 U.S.C.A. § 334(d) if it so desires.

Civil No. 6–187

Findings of Fact

1. On December 19 and 20, 1960 at its fish plant at Rockland, Maine, the claimant unloaded from one of it trawlers, the F/V Storm, approximately 308,-000 pounds of Ocean Perch (sometimes known as red fish or rose fish), which had been caught on the Grand Banks, off Newfoundland, in the waters of the Atlantic Ocean outside the territorial limits of the State of Maine and the United States. The F/V Storm departed Rockland for the trip upon which these fish were caught on November 30, 1960 and returned to Rockland on December 19, 1960. The first of the fish were caught on December 4, and the last of the fish were caught on December 14. All of the frozen fillets involved in this action were cut from the fish caught on this trip.

2. On December 19, 20 and 21, 1960 approximately 293,500 pounds of the fish unloaded from the F/V Storm as described in paragraph 1 were filleted and packed in cartons of either 12 ounces or 5 pounds each, hard frozen, placed in cases containing either 10 5-pound cartons or 12 12-ounce cartons each, and stored in the cold storage room in claimant's fish plant at Rockland.

3. The fish and fillets involved in this action were handled in accordance with claimant's usual practice, which is as follows:

All trawlers used by claimant for catching Ocean Perch are owned and operated by claimant, are refrigerated, and are cleaned prior to each trip. As fish are caught, they are placed in bins in the hold of the trawler and are covered with ice to help preserve them for the balance of the trip. The average trip to the Grand Banks lasts less than 20 days.

Upon return of a trawler to claimant's Rockland fish plant, the fish are immediately unloaded under the constant observation of claimant's "back shop" foreman, whose sole task is to check the fish for freshness and quality. The best fish are classified as Class 1 and are packed as claimant's best quality brands, of which its "Port-O-Rockland" brand is one. Older fish are classified as Class 2 and are separately processed and packed as claimant's second quality brands, of which its "40-Fathom" brand is one. Under-sized fish are classified as "culls" and are separately processed and packed under claimant's lowest quality brand, which is called "Sea Fresh". Rotten or bad fish are classified as "gurry". Gurry is not processed, but is sold for fish meal.

There are three processing and packaging lines in claimant's plant, each capable of handling 2,000 pounds of fish per hour. During the processing and packaging, the whole fish and fillets are under constant visual observation by claimant's foremen, who check for freshness and quality, and claimant's packing room foreman, who is also its quality control supervisor, withdraws 100 fillets each hour for organoleptic testing by smell. After cutting and "candling", the fillets are quick frozen, and either stored in the plant cold storage room or loaded in refrigerated trucks for shipment.

The quality control measures employed by claimant, both in the operation of its trawlers and in the processing and packing of the fillets in its plant, are above average for the Ocean Perch industry.

4. Approximately 16,000 pounds of the fish unloaded from the trip of the F/V Storm described in paragraph 1 were rejected by claimant as "gurry", and approximately 25,000 pounds were classified by claimant as Class 2 fish and packed by claimant under its "40-Fathom" label. A normal amount of "culls" was packed under claimant's "Sea Fresh" label.[5] The "Port-O-Rockland" lot here involved was packed from Class 1 fish.

5. On January 9, 1961 an Inspector of the Federal Food and Drug Administration randomly selected for testing 1 5-pound package from each of 20 cases from a lot of 388 cases, more or less, each case containing 10 5-pound packages of fillets, which had been packed by claimant on or about December 19, 1960 under its "Port-O-Rockland" label and shipped by claimant on or about December 20, 1960 from Rockland to Granite City Cold Storage, Inc., at Quincy, Massachusetts. This is the lot of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lot of which they were a part.

On January 11, 1961 organoleptic examination by smell was made of these samples by qualified Food and Drug Administration analysts at the Food and Drug Administration Laboratory in Boston, Massachusetts with the following results:

Total Number of Fillets
Examined: 1213

| | | | | | |
|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 1064 | (87.7%) |
| " | " | " | 2 | " | 76 | ( 6.3%) |
| " | " | " | 3 | " | 73 | ( 6.0%) |

6. On January 17, 1961, at claimant's request, an Inspector of the Federal Food and Drug Administration randomly selected for testing 1 5-pound package from each of 20 cases from the lot of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lot of which they were a part.

On or about January 19, 1961 organoleptic examination by smell was made of these samples by qualified Food and Drug Administration analysts at the Food and Drug Administration Laboratory in Boston with the following results:

Total Number of Fillets
Examined: 1188

| | | | | | |
|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 1025 | (86.3%) |
| " | " | " | 2 | " | 99 | ( 8.3%) |
| " | " | " | 3 | " | 64 | ( 5.4%) |

7. The results of organoleptic examinations by smell of pre-seizure samples randomly selected from the lot of frozen fillets involved in this action, which were offered in evidence by claimant, were as follows:

(1) Examination by claimant's personnel, January 15, 1961:

Total Number of Fillets
Examined: 280 [6]
(5 5-pound packages)

1145 fillets so obtained showed 72 (6.3%) Class 2 fillets and 7 (.6%) Class 3 fillets. Condemnation proceedings were not instituted against this lot.

5. On January 16, 1961 a Food and Drug Administration Inspector at Carnegie, Pa., selected samples from a lot of 500 cases, more or less, packed by claimant from this fish under its "Sea Fresh" label. Organoleptic examination by smell of

6. This sample was drawn from both the lot here involved and the lot involved in

Number of Class 1 fillets    272 (97.1%)
   "    "    " 2    "     8 ( 2.9%)
   "    "    " 3    "     0

(2) Examination by Birds Eye representative, February 7, 1961 (at request of claimant):

Total Number of Fillets
   Examined:       111
(2 5-pound packages)

Number of Class 1 fillets    104 (93.7%)
   "    "    " 2    "     7 ( 6.3%)
   "    "    " 3    "     0

8. On February 10, 1961 the United States of America filed the libel of information in this action seeking condemnation of the lot of frozen fillets here involved.

9. On March 9, 1961, pursuant to order of this Court issued under Section 334(c) of the Act, an Inspector of the Food and Drug Administration and a representative of claimant, in the presence of the United States Marshal, collected duplicate post-seizure samples for testing, each set of samples consisting of 1 5-pound package from each of 20 cases from the lot of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lot of which they were a part.

10. On or about March 19, 1961 organoleptic examination by smell was made of the post-seizure samples selected by the Food and Drug Administration by qualified Food and Drug Administration analysts in the Food and Drug Administration Laboratory in Washington, D. C., with the following results:

Total Number of Fillets
   Examined:       1042

Number of Class 1 fillets    667 (63.8%)
   "    "    " 2    "    234 (22.5%)
   "    "    " 3    "    141 (13.7%)

The analysts who conducted the foregoing tests in Washington were experienced analysts and leading authorities in the field of organoleptic examina-

tion of food products, especially frozen fish fillets.

11. On March 15 and 16, 1961 organoleptic examination by smell was made of the post-seizure samples selected by claimant by representatives of claimant in its plant at Rockland, Maine, with the following results:

(1) Examination by claimant's personnel, March 15, 1961:

Total Number of Fillets
   Examined:       568
(10 5-pound packages)

Number of Class 1 fillets    552 (97.2%)
   "    "    " 2    "     14 ( 2.5%)
   "    "    " 3    "      2 ( 0.3%)

(2) Examination by claimant's quality control supervisor and Birds Eye representative, March 16, 1961:

Total Number of Fillets
   Examined:       601
(10 5-pound packages)

Number of Class 1 fillets    586 (97.5%)
   "    "    " 2    "     11 ( 1.8%)
   "    "    " 3    "      4 ( 0.7%)

Taste tests by the same representatives of nine of the Class 2 fillets revealed no disagreeable taste. The two Class 3 fillets which were similarly tested tasted "rancid".

12. The aggregate results of the organoleptic examinations by smell conducted by the Food and Drug Administration analysts of both the pre-seizure and post-seizure samples as described in paragraphs 5, 6 and 10 are as follows:

Total Number of Fillets
   Examined:       3443

Number of Class 1 fillets    2756 (80.0%)
   "    "    " 2    "    409 (11.9%)
   "    "    " 3    "    278 ( 8.1%)

13. The aggregate results of the organoleptic examinations by smell con-

Civil No. 6–188. Since the results were lumped together by claimant, the Court

has included them as such in its findings in both actions.

ducted by claimant of both the pre-seizure and post-seizure samples as described in paragraphs 7 and 11 are as follows:

Total Number of Fillets
Examined: 1560 [7]

Number of Class 1 fillets  1514 (97.1%)
  " " " 2 "    40 ( 2.5%)
  " " " 3 "     6 ( 0.4%)

14. From the date of processing to the present time all of the frozen fillets involved in this action have been continuously in hard-frozen form, and their quality and condition as regards decomposition was the same at the time of the tests hereinabove described as it was when they were packed.

15. The organoleptic test by smell as used in this action by the Food and Drug Administration analysts and by the analysts presented by claimant was developed by the Food and Drug Administration some twenty years ago, and is accepted by the Food and Drug Administration and by the fish industry both as a reliable method and as the standard method for detecting the state of decomposition in frozen fish fillets, including frozen Ocean Perch fillets. It is conducted by thawing the hard frozen fillets in cold running water; removing the fillets from the water; weighing and counting the fillets; and then breaking open each fillet and smelling it with the nose closely in contact with the flesh.

The following classifications are utilized both by the Food and Drug Administration and by the fish industry in this test:

*Class 1 fillets*—No odor,[8] or a slight stale odor or a slight fishy odor which is characteristic of the species, but not offensive.

*Class 2 fillets*—A slight but distinct odor of decomposition, which may quickly dissipate on contact with air. The Food and Drug Administration analysts describe this odor as offensive; claimant's analysts describe it as a "gassy" odor, but not offensive.[9]

*Class 3 fillets*—A decidedly strong odor of decomposition. Both the Food and Drug Administration analysts and claimant's analysts describe this odor as definitely offensive. They also agree that the difference between the odor of decomposition in a Class 2 fillet and that in a Class 3 fillet is one of degree and not of kind.

Upon all the evidence in this action, in the evaluation of which the Court has been assisted by a demonstration,[10] the Court finds that although the Food and Drug Administration analysts and claimant's analysts tended to use different words to describe the odors identified by them as belonging in each of the foregoing classifications, in fact they were describing the same odors—that is to say, that all of the analysts who testified

---

7. Full credit given for joint sample referred to in Footnote 6, supra.

8. Although the Food and Drug Administration places a fillet having no odor in a separate Class 0, Class 0 was not utilized by it in this action.

9. Also included in Class 2 are other odors, such as bilge and freezer odors, which are not germane to this action. Insofar as the record reveals, none of the frozen fillets involved in this action had bilge or freezer odors.

10. At the instance of the Court, with the approval of the parties, a demonstration of an organoleptic test by smell was conducted at the close of all the evidence at the Cafeteria of the Portland

High School. Two analysts who had testified at the trial, one designated by each party, smelled and classified approximately 200 fillets from the lots here involved. Since the fillets were not representative samples of the fillets seized, the demonstration was for the sole purpose of assisting the Court in understanding and evaluating the evidence by observing how often the two analysts would place a given fillet in the same class, and by permitting the Court to observe and smell a few representative fillets. Of the 204 fillets examined, the Government's expert placed 25 in Class 2 and none in Class 3; the claimant's expert placed 27 in Class 2 and none in Class 3. There was no substantial disagreement between them.

at the trial would classify almost every fillet with a given odor in the same class.

16. The Food and Drug Administration and the fish industry recognize that a Class 3 fillet is in an advanced state of decomposition, is offensive in smell and in taste, and is unfit for food, and the Court so finds. The Food and Drug Administration and the fish industry are in disagreement as to the state of decomposition of a Class 2 fillet and as to the offensiveness of its smell, but the Court deems it unnecessary, in view of its finding with respect to Class 3 fillets, to make any finding in this respect.

17. Upon all the evidence in this action, including primarily the results of the organoleptic tests hereinabove set forth, which have been evaluated after a consideration of the experience, qualifications and interest of the analysts who conducted them, the Court finds that the lot of frozen fillets here involved contains in excess of 10% Class 2 fillets and in excess of 6% Class 3 fillets, which extend throughout the entire lot.

18. The percentage of Class 3 fillets in the lot of frozen fillets here involved is substantially in excess of any administrative tolerance indicated in the record.

19. The results of the chemical tests of selected post-seizure samples conducted by the Food and Drug Administration and by claimant, while tending to correlate with the organoleptic classifications of Class 2 fillets by the Food and Drug Administration, were inconclusive as to the existence or non-existence of Class 3 fillets because of the loss of chemical indices in the preparation of the Food and Drug Administration's samples for testing and because of the limited nature of claimant's tests, and the Court has therefore not taken these chemical tests into account in making the foregoing findings.

### Conclusions of Law

1. This Court has jurisdiction of this action and of the parties hereto.

2. The lot of frozen Ocean Perch fillets involved in this action constitutes an article of food within the meaning of 21 U.S.C.A. § 334(a). A. O. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542; United States v. 43½ Gross Rubber Prophylactics, D.C.D.Minn.1946, 65 F. Supp. 534, affirmed sub nom. Gellman v. United States, 8 Cir., 1947, 159 F.2d 881; United States v. 935 Cases, etc., D.C.N.D.Ohio 1946, 65 F.Supp. 503, 504.

3. A Class 3 Ocean Perch fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3).

4. The lot of frozen Ocean Perch fillets involved in this action was adulterated when introduced into or while in interstate commerce, or while held for sale after shipment in interstate commerce, within the meaning of 21 U.S.C.A. § 342(a) (3) because it consisted in part of a decomposed substance by reason of the presence therein of in excess of 6% Class 3 fillets. Compare United States v. 1851 Cartons, etc., 10 Cir., 1945, 146 F.2d 760.

5. The lot of frozen Ocean Perch fillets involved in this action is liable to seizure and condemnation by the United States of America pursuant to 21 U.S.C.A. § 334(a).

6. Because of the presence in the lot of frozen Ocean Perch fillets involved in this action of more than 6% Class 3 fillets, it is unnecessary for the Court to consider: (1) whether 21 U.S.C.A. § 342(a) (3) admits of a de minimis exception, see United States v. 233 Tins, etc., D.C.W.D.Ark.1959, 175 F.Supp. 694, 702; (2) whether 21 U.S.C.A. § 342(a) (3) permits the Court to recognize an administrative tolerance of less than 6% Class 3 fillets, see United States v. 1500 Cases, etc., 7 Cir., 1956, 236 F.2d 208; (3) whether a Class 2 fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3) or whether the presence of Class 2 fillets is otherwise significant under that section; or (4) whether a food product which consists wholly or in part of a decomposed substance, but which is not unfit for food, is adulterated within the meaning of 21 U.S.C.A. § 342(a) (3), see United States

v. 1500 Cases, etc., supra; United States v. 449 Cases, etc., 2 Cir., 1954, 212 F.2d 567, 45 A.L.R.2d 846 (majority and dissenting opinions).

The Court will render its final judgment in this action in a separate written decree of condemnation and forfeiture, which is to be prepared by the Government, approved as to form by the claimant, and submitted to the Court for its approval and signature within ten days from this date. After entry of the decree, the claimant may have the benefit of the provisions of 21 U.S.C.A. § 334(d) if it so desires.

Civil No. 6–188

Findings of Fact

1. On December 19 and 20, 1960 at its fish plant at Rockland, Maine, the claimant unloaded from one of its trawlers, the F/V Storm, approximately 308,000 pounds of Ocean Perch (sometimes known as red fish or rose fish), which had been caught on the Grand Banks, off Newfoundland, in the waters of the Atlantic Ocean outside the territorial limits of the State of Maine and the United States. The F/V Storm departed Rockland for the trip upon which these fish were caught on November 30, 1960 and returned to Rockland on December 19, 1960. The first of the fish were caught on December 4, and the last of the fish were caught on December 14. All of the frozen fillets involved in this action were cut from the fish caught on this trip.

2. On December 19, 20 and 21, 1960 approximately 293,500 pounds of the fish unloaded from the F/V Storm as described in paragraph 1 were filleted and packed in cartons of either 12 ounces or 5 pounds each, hard frozen, placed in cases containing either 10 5-pound cartons or 12 12-ounce cartons each, and stored in the cold storage room in claimant's fish plant at Rockland.

3. The fish and fillets involved in this action were handled in accordance with claimant's usual practice, which is as follows:

All trawlers used by claimant for catching Ocean Perch are owned and operated by claimant, are refrigerated, and are cleaned prior to each trip. As fish are caught, they are placed in bins in the hold of the trawler and are covered with ice to help preserve them for the balance of the trip. The average trip to the Grand Banks lasts less than 20 days.

Upon return of a trawler to claimant's Rockland fish plant, the fish are immediately unloaded under the constant observation of claimant's "back shop" foreman, whose sole task is to check the fish for freshness and quality. The best fish are classified as Class 1 and are packed as claimant's best quality brands, of which its "Port-O-Rockland" brand is one. Older fish are classified as Class 2 and are separately processed and packed as claimant's second quality brands, of which its "40-Fathom" brand is one. Under-sized fish are classified as "culls" and are separately processed and packed under claimant's lowest quality brand, which is called "Sea Fresh". Rotten or bad fish are classified as "gurry". Gurry is not processed, but is sold for fish meal.

There are three processing and packaging lines in claimant's plant, each capable of handling 2,000 pounds of fish per hour. During the processing and packaging, the whole fish and fillets are under constant visual observation by claimant's foremen, who check for freshness and quality, and claimant's packing room foreman, who is also its quality control supervisor, withdraws 100 fillets each hour for organoleptic testing by smell. After cutting and "candling", the fillets are quick frozen, and either stored in the plant cold storage room or loaded in refrigerated trucks for shipment.

The quality control measures employed by claimant, both in the operation of its trawlers and in the processing and packing of the fillets in its plant, are above average for the Ocean Perch industry.

4. Approximately 16,000 pounds of the fish unloaded from the trip of the F/V Storm described in paragraph 1

were rejected by claimant as "gurry", and approximately 25,000 pounds were classified by claimant as Class 2 fish and packed by claimant under its "40-Fathom" label. A normal amount of "culls" was packed under claimant's "Sea Fresh" label.[11] The "Port-O-Rockland" lot here involved was packed from Class 1 fish.

5. On January 12, 1961 an Inspector of the Federal Food and Drug Administration randomly selected for testing 1 5-pound package from each of 20 cases from a lot of 518 cases, more or less, each case containing 10 5-pound packages of fillets, which had been packed by claimant on or about December 20, 1960 under its "Port-O-Rockland" label and shipped by claimant on or about December 21, 1960 from Rockland to Granite City Cold Storage, Inc., at Quincy, Massachusetts. This is the lot of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lot of which they were a part.

6. On January 17, 1961 organoleptic examination by smell was made of these samples by qualified Food and Drug Administration analysts at the Food and Drug Administration Laboratory in Boston, Massachusetts with the following results:

Total Number of Fillets
   Examined:     1188

Number of Class 1 fillets   987 (83.1%)
   "   "   "  2   "    106 ( 8.9%)
   "   "   "  3   "     95 ( 8.0%)

7. The results of organoleptic examinations by smell of pre-seizure samples randomly selected from the lot of frozen fillets involved in this action, which were

offered in evidence by claimant, were as follows:

(1) Examination by claimant's personnel, January 15, 1961:

Total Number of Fillets
   Examined:     280
(5 5-pound packages)[12]

Number of Class 1 fillets   272 (97.1%)
   "   "   "  2   "      8 ( 2.9%)
   "   "   "  3   "      0

(2) Examination by Birds Eye representative, February 7, 1961 (at request of claimant):

Total Number of Fillets
   Examined:     127
(2 5-pound packages)

Number of Class 1 fillets   125 (98.4%)
   "   "   "  2   "      2 ( 1.6%)
   "   "   "  3   "      0

8. On February 15, 1961 the United States of America filed the libel of information in this action seeking condemnation of the lot of frozen fillets here involved.

9. On March 9, 1961, pursuant to order of this Court issued under Section 334(c) of the Act, an Inspector of the Food and Drug Administration and a representative of claimant, in the presence of the United States Marshal, collected duplicate post-seizure samples for testing, each set of samples consisting of 1 5-pound package from each of 20 cases from the lot of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lot of which they were a part.

10. On or about March 18, 1961 organoleptic examination by smell was made of the post-seizure samples selected

---

11. On January 16, 1961 a Food and Drug Administration Inspector at Carnegie, Pa., selected samples from a lot of 500 cases, more or less, packed by claimant from this fish under its "Sea Fresh" label. Organoleptic examination by smell of 1145 fillets so obtained showed 72 (6.3%) Class 2 fillets and 7 (.6%) Class

3 fillets. Condemnation proceedings were not instituted against this lot.

12. This sample was drawn from both the lot here involved and the lot involved in Civil No. 6–187. Since the results were lumped together by claimant, the Court has included them as such in its findings in both actions.

by the Food and Drug Administration by qualified Food and Drug Administration analysts in the Food and Drug Administration Laboratory in Washington, D. C., with the following results:

Total Number of Fillets
Examined: 1051

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 741 | (70.5%) |
| " | " | " | 2 | " | 193 | (18.4%) |
| " | " | " | 3 | " | 117 | (11.1%) |

The analysts who conducted the foregoing tests in Washington were experienced analysts and leading authorities in the field of organoleptic examination of food products, especially frozen fish fillets.

11. On March 15 and 16, 1961 organoleptic examination by smell was made of the post-seizure samples selected by claimant by representatives of claimant in its plant at Rockland, Maine, with the following results:

(1) Examination by claimant's personnel, March 15, 1961:

Total Number of Fillets
Examined: 589
(10 5-pound packages)

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 573 | (97.3%) |
| " | " | " | 2 | " | 16 | ( 2.7%) |
| " | " | " | 3 | " | 0 | |

(2) Examination by claimant's quality control supervisor and Birds Eye representative, March 16, 1961:

Total Number of Fillets
Examined: 621
(10 5-pound packages)

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 608 | (98.0%) |
| " | " | " | 2 | " | 9 | ( 1.4%) |
| " | " | " | 3 | " | 4 | ( .6%) |

Taste tests by the same representatives of ten of the Class 2 fillets revealed no disagreeable taste, although two had a "stronger taste".

12. The aggregate results of the organoleptic examinations by smell conducted by the Food and Drug Administration analysts of both the pre-seizure and post-seizure samples as described in paragraphs 6 and 10 are as follows:

Total Number of Fillets
Examined: 2239

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 1728 | (77.1%) |
| " | " | " | 2 | " | 299 | (13.4%) |
| " | " | " | 3 | " | 212 | ( 9.5%) |

13. The aggregate results of the organoleptic examination by smell conducted by claimant of both the pre-seizure and post-seizure samples as described in paragraphs 7 and 11 are as follows:

Total Number of Fillets
Examined: 1617 [13]

| | | | | | | |
|---|---|---|---|---|---|---|
| Number of Class 1 fillets | | | | 1578 | (97.6%) |
| " | " | " | 2 | " | 35 | ( 2.2%) |
| " | " | " | 3 | " | 4 | ( .2%) |

14. From the date of processing to the present time all of the frozen fillets involved in this action have been continuously in hard-frozen form, and their quality and condition as regards decomposition was the same at the time of the tests hereinabove described as it was when they were packed.

15. The organoleptic tests by smell as used in this action by the Food and Drug Administration analysts and by the analysts presented by claimant was developed by the Food and Drug Administration some twenty years ago, and is accepted by the Food and Drug Administration and by the fish industry both as a reliable method and as the standard method for detecting the state of decomposition in frozen fish fillets, including frozen Ocean Perch fillets. It is conducted by thawing the hard frozen fillets in cold running water; removing the fillets from the water; weighing and counting the fillets; and then breaking open each fillet and smelling it with the nose closely in contact with the flesh.

The following classifications are utilized both by the Food and Drug Admin-

13. Full credit given for joint sample referred to in Footnote 12, supra.

istration and by the fish industry in this test:

*Class 1 fillets*—No odor,[14] or a slight stale odor or a slight fishy odor which is characteristic of the species, but not offensive.

*Class 2 fillets*—A slight but distinct odor of decomposition, which may quickly dissipate on contact with air. The Food and Drug Administration analysts describe this odor as offensive; claimant's analysts describe it as a "gassy" odor, but not offensive.[15]

*Class 3 fillets*—A decidedly strong odor of decomposition. Both the Food and Drug Administration analysts and claimant's analysts describe this odor as definitely offensive. They also agree that the difference between the odor of decomposition in a Class 2 fillet and that in a Class 3 fillet is one of degree and not of kind.

Upon all the evidence in this action, in the evaluation of which the Court has been assisted by a demonstration,[16] the Court finds that although the Food and Drug Administration analysts and claimant's analysts tended to use different words to describe the odors identified by them as belonging in each of the foregoing classifications, in fact they were describing the same odors—that is to say, that all of the analysts who testified at the trial would classify almost every fillet with a given odor in the same class.

16. The Food and Drug Administration and the fish industry recognize that a Class 3 fillet is in an advanced state of decomposition, is offensive in smell and in taste, and is unfit for food, and the Court so finds. The Food and Drug Administration and the fish industry are in disagreement as to the state of decomposition of a Class 2 fillet and as to the offensiveness of its smell, but the Court deems it unnecessary, in view of its finding with respect to Class 3 fillets, to make any finding in this respect.

17. Upon all the evidence in this action, including primarily the results of the organoleptic tests hereinabove set forth, which have been evaluated after a consideration of the experience, qualifications and interest of the analysts who conducted them, the Court finds that the lot of frozen fillets here involved contains in excess of 10% Class 2 fillets and in excess of 6% Class 3 fillets, which extend throughout the entire lot.

18. The percentage of Class 3 fillets in the lot of frozen fillets here involved is substantially in excess of any administrative tolerance indicated in the record.

19. The results of the chemical tests of selected post-seizure samples conducted by the Food and Drug Administration and by claimant, while tending to correlate with the organoleptic classifications of Class 2 fillets by the Food and Drug Administration, were inconclusive as to the existence or non-existence of Class 3 fillets because of the loss of chemical indices in the preparation of the Food and Drug Administration's samples for

14. Although the Food and Drug Administration places a fillet having no odor in a separate Class 0, Class 0 was not utilized by it in this action.

15. Also included in Class 2 are other odors, such as bilge and freezer odors, which are not germane to this action. Insofar as the record reveals, none of the frozen fillets involved in this action had bilge or freezer odors.

16. At the instance of the Court, with the approval of the parties, a demonstration of an organoleptic test by smell was conducted at the close of all the evidence at the Cafeteria of the Portland High School. Two analysts who had testified at the trial, one designated by each par-

ty, smelled and classified approximately 200 fillets from the lots here involved. Since the fillets were not representative samples of the fillets seized, the demonstration was for the sole purpose of assisting the Court in understanding and evaluating the evidence by observing how often the two analysts would place a given fillet in the same class, and by permitting the Court to observe and smell a few representative fillets. Of the 204 fillets examined, the Government's expert placed 25 in Class 2 and none in Class 3; the claimant's expert placed 27 in Class 2 and none in Class 3. There was no substantial disagreement between them.

testing and because of the limited nature of claimant's tests, and the Court has therefore not taken these chemical tests into account in making the foregoing findings.

## Conclusions of Law

1. This Court has jurisdiction of this action and of the parties hereto.

2. The lot of frozen Ocean Perch fillets involved in this action constitutes an article of food within the meaning of 21 U.S.C.A. § 334(a). A. O. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542; United States v. 43½ Gross Rubber Prophylactics, D.C.D.Minn.1946, 65 F. Supp. 534, affirmed *sub nom.* Gellman v. United States, 8 Cir., 1947, 159 F.2d 881; United States v. 935 Cases, etc., D.C.N.D. Ohio 1946, 65 F.Supp. 503, 504.

3. A Class 3 Ocean Perch fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3).

4. The lot of frozen Ocean Perch fillets involved in this action was adulterated when introduced into or while in interstate commerce, or while held for sale after shipment in interstate commerce, within the meaning of 21 U.S.C.A. § 342(a) (3) because it consisted in part of a decomposed substance by reason of the presence therein of in excess of 6% Class 3 fillets. Compare United States v. 1851 Cartons, etc., 10 Cir., 1945, 146 F.2d 760.

5. The lot of frozen Ocean Perch fillets involved in this action is liable to seizure and condemnation by the United States of America pursuant to 21 U.S. C.A. § 334(a).

6. Because of the presence in the lot of frozen Ocean Perch fillets involved in this action of more than 6% Class 3 fillets, it is unnecessary for the Court to consider: (1) whether 21 U.S.C.A. § 342 (a) (3) admits of a *de minimis* exception, see United States v. 233 Tins, etc., D.C. W.D.Ark.1959, 175 F.Supp. 694, 702; (2) whether 21 U.S.C.A. § 342(a) (3) permits the Court to recognize an administrative tolerance of less than 6%

Class 3 fillets, see United States v. 1500 Cases, etc., 7 Cir., 1956, 236 F.2d 208; (3) whether a Class 2 fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3) or whether the presence of Class 2 fillets is otherwise significant under that section; or (4) whether a food product which consists wholly or in part of a decomposed substance, but which is not unfit for food, is adulterated within the meaning of 21 U.S.C.A. § 342(a) (3), see United States v. 1500 Cases, etc., *supra*; United States v. 449 Cases, etc., 2 Cir., 1954, 212 F.2d 567, 45 A.L.R.2d 846 (majority and dissenting opinions).

The Court will render its final judgment in this action in a separate written decree of condemnation and forfeiture, which is to be prepared by the Government, approved as to form by the claimant, and submitted to the Court for its approval and signature within ten days from this date. After entry of the decree, the claimant may have the benefit of the provisions of 21 U.S.C.A. § 334(d) if it so desires.

## Civil No. 6–189
## Findings of Fact

1. On December 19 and 20, 1960 at its fish plant at Rockland, Maine, the claimant unloaded from one of its trawlers, the F/V Storm, approximately 308,-000 pounds of Ocean Perch (sometimes known as red fish or rose fish), which had been caught on the Grand Banks, off Newfoundland, in the waters of the Atlantic Ocean outside the territorial limits of the State of Maine and the United States. The F/V Storm departed Rockland for the trip upon which these fish were caught on November 30, 1960 and returned to Rockland on December 19, 1960. The first of the fish were caught on December 4, and the last of the fish were caught on December 14. On December 19, 20 and 21, 1960 approximately 293,-500 pounds of this fish were filleted and packed in cartons of either 12 ounces or 5 pounds each, hard frozen, placed in cases containing either 10 5-pound car-

tons or 12 12-ounce cartons each, and stored in the cold storage room in claimant's fish plant at Rockland.

2. Most of the frozen fillets involved in this action were cut from the fish caught on the trip of the F/V Storm described in paragraph 1, or were cut from Ocean Perch similarly caught on a trip by another of claimant's trawlers, the F/V Surf, which was unloaded at claimant's fish plant at Rockland on or about December 13, 1960, and which was filleted and packed by claimant in the manner described in paragraph 1. The remainder of the frozen fillets involved in this action were similarly caught and processed from fish caught on five or more other trips by claimant's trawlers during the months of October, November and December, 1960, the particulars of which do not appear of record. The cases containing the frozen fillets involved in this action were coded by trip, but the number of cases bearing any particular code does not appear of record.

3. The fish and fillets involved in this action were handled in accordance with claimant's usual practice, which is as follows:

All trawlers used by claimant for catching Ocean Perch are owned and operated by claimant, are refrigerated, and are cleaned prior to each trip. As fish are caught, they are placed in bins in the hold of the trawler and are covered with ice to help preserve them for the balance of the trip. The average trip to the Grand Banks lasts less than 20 days.

Upon return of a trawler to claimant's Rockland fish plant, the fish are immediately unloaded under the constant observation of claimant's "back shop" foreman, whose sole task is to check the fish for freshness and quality. The best fish are classified as Class 1 and are packed as claimant's best quality brands, of

which its "Port-O-Rockland" brand is one. Older fish are classified as Class 2 and are separately processed and packed as claimant's second quality brands, of which its "40-Fathom" brand is one. Under-sized fish are classified as "culls" and are separately processed and packed under claimant's lowest quality brand, which is called "Sea Fresh". Rotten or bad fish are classified as "gurry". Gurry is not processed, but is sold for fish meal.

There are three processing and packaging lines in claimant's plant, each capable of handling 2,000 pounds of fish per hour. During the processing and packaging, the whole fish and fillets are under constant visual observation by claimant's foremen who check for freshness and quality, and claimant's packing room foreman, who is also its quality control supervisor, withdraws 100 fillets each hour for organoleptic testing by smell. After cutting and "candling", the fillets are quick frozen, and either stored in the plant cold storage room or loaded in refrigerated trucks for shipment.

The quality control measures employed by claimant, both in the operation of its trawlers and in the processing and packing of the fillets in its plant, are above average for the Ocean Perch industry.

4. Approximately 16,000 pounds of the fish unloaded from the trip of the F/V Storm described in paragraph 1 were rejected by claimant as "gurry", and approximately 25,000 pounds were classified by claimant as Class 2 fish and packed by claimant under its "40-Fathom" label. A normal amount of "culls" was packed under claimant's "Sea Fresh" label.[17] The amount of "gurry", Class 2 fish, and "culls" if any, unloaded from the trips of the F/V Surf and claimant's other trawlers described in paragraph 2 does not appear of record.[18] All of the

17. On January 16, 1961 a Food and Drug Administration Inspector at Carnegie Pa., selected samples from a lot of 500 cases, more or less, packed by claimant from the fish caught on the trip of the F/V Storm under its "Sea Fresh" label. Organoleptic examination by smell of

1145 fillets so obtained showed 72 (6.3%) Class 2 fillets and 7 (.6%) Class 3 fillets. Condemnation proceedings were not instituted against this lot.

18. On January 17, 1961 a Food and Drug Administration Inspector at Carthage,

frozen fillets involved in this action were cut from Class 1 fish.

5. On January 13, 1961 an Inspector of the Federal Food and Drug Administration randomly selected for testing 2 12-ounce packages from each of 60 cases (most of which bore the codes "EPROY" or "EPONY")[19] from a lot of 2975 cases, more or less, each case containing 12 12-ounce packages of fillets, which had been packed by claimant under a "Birds Eye" label and shipped by claimant on or about December 20, 1960 from Rockland to Quincy Market Cold Storage and Warehouse Co., at Watertown, Massachusetts. This is the lot of frozen fillets involved in this action. The packages thus selected as samples were representative of the quality and condition of the lot of which they were a part.

6. On January 19, 1961 organoleptic examination by smell was made of these samples by qualified Food and Drug Administration analysts at the Food and Drug Administration Laboratory in Boston, Massachusetts with the following results:

Total Number of Fillets
  Examined:                     989

| Number of Class 1 fillets | 873 | (88.3%) |
| " " " 2 " | 72 | ( 7.3%) |
| " " " 3 " | 44 | ( 4.4%) |

7. The results of organoleptic examinations by smell of pre-seizure samples randomly selected from the lot of frozen fillets involved in this action, which were

Missouri, selected samples from a lot of 53 cases, more or less, packed by claimant from the fish caught on the trip of the F/V Surf under its "Sea Fresh" label. Organoleptic examination by smell of 1060 fillets so obtained showed 30 (2.8%) Class 2 fillets and 18 (1.7%) Class 3 fillets. Condemnation proceedings were not instituted against this lot.

offered in evidence by claimant, were as follows:

(1) Examination by Birds Eye representative on various dates in January, 1961:

Total Number of Fillets
  Examined:                     1807
(226 12-ounce packages)

| Number of Class 1 fillets | 1737 | (96.1%) |
| " " " 2 " | 61 | ( 3.4%) |
| " " " 3 " | 9 | ( .5%) |

(2) Examination by same Birds Eye representative, February 7, 1961 (at request of claimant):

Total Number of Fillets
  Examined:                     1014
(132 12-ounce packages)

| Number of Class 1 fillets | 976 | (96.3%) |
| " " " 2 " | 34 | ( 3.3%) |
| " " " 3 " | 4 | ( .4%) |

The packages selected as samples for the foregoing tests were representative of the quality and condition of the lot of which they were a part.

8. On February 17, 1961 the United States of America filed the libel of information in this action seeking condemnation of the lot of frozen fillets here involved.

9. On March 9, 1961, pursuant to order of this Court issued under Section 334(c) of the Act, an Inspector of the Food and Drug Administration and a representative of claimant, in the presence of the United States Marshal, collected duplicate post-seizure samples for testing, each set of samples consisting of 2 12-ounce packages from each of 60 cases from the lot of frozen fillets involved in this action.[20] The packages thus selected

19. Cases coded "EPROY" contained fillets cut from the trip of the F/V Storm described in paragraph 1. Cases coded "EPONY" contained fillets cut from the trip of the F/V Surf described in paragraph 2.

20. Of the 60 cases, 16 bore the code "EPROY" and 12 bore the code "EPONY".

as samples were representative of the quality and condition of the lot of which they were a part.

10. On or about March 17, 1961 organoleptic examination by smell was made of the post-seizure samples selected by the Food and Drug Administration by qualified Food and Drug Administration analysts in the Food and Drug Administration Laboratory in Washington, D. C., with the following results:

Total Number of Fillets
  Examined:                    948

Number of Class 1 fillets    737  (77.7%)
  "    "    "  2    "         142  (15.0%)
  "    "    "  3    "          69  ( 7.3%)

The analysts who conducted the foregoing tests in Washington were experienced analysts and leading authorities in the field of organoleptic examination of food products, especially frozen fish fillets.

11. On March 15 and 16, 1961 organoleptic examination by smell was made of the post-seizure samples selected by claimant by representatives of claimant in its plant at Rockland, Maine, with the following results:

(1) Examination by claimant's personnel, March 15, 1961:

Total Number of Fillets
  Examined:                    587
(72 12-ounce packages)

Number of Class 1 fillets    572  (97.4%)
  "    "    "  2    "          14  ( 2.4%)
  "    "    "  3    "           1  (  .2%)

(2) Examination by claimant's quality control supervisor and Birds Eye representative, March 16, 1961:

Total Number of Fillets
  Examined:                    410
(48 12-ounce packages)

Number of Class 1 fillets    398  (97.1%)
  "    "    "  2    "           9  ( 2.2%)
  "    "    "  3    "           3  (  .7%)

Taste tests by the same representatives of ten of the Class 2 fillets revealed no disagreeable taste, although five had a "stronger flavor". The one Class 3 fillet which was similarly taste tested was found to be "bad".

12. The aggregate results of the organoleptic examinations by smell conducted by the Food and Drug Administration analysts of both the pre-seizure and post-seizure samples as described in paragraphs 6 and 10 as follows:

Total Number of Fillets
  Examined:                    1937

Number of Class 1 fillets    1610  (83.1%)
  "    "    "  2    "          214  (11.1%)
  "    "    "  3    "          113  ( 5.8%)

13. The aggregate results of the organoleptic examination by smell conducted by claimant of both the pre-seizure and post-seizure samples as described in paragraphs 7 and 11 are as follows:

Total Number of Fillets
  Examined:                    3818

Number of Class 1 fillets    3683  (96.5%)
  "    "    "  2    "          118  ( 3.1%)
  "    "    "  3    "           17  (  .4%)

14. From the date of processing to the present time all of the frozen fillets involved in this action have been continuously in hard-frozen form, and their quality and condition as regards decomposition was the same at the time of the tests hereinabove described as it was when they were packed.

15. The organoleptic test by smell as used in this action by the Food and Drug Administration analysts and by the analysts presented by claimant was developed by the Food and Drug Administration some twenty years ago, and is accepted by the Food and Drug Administration and by the fish industry both as a reliable method and as the standard method for detecting the state of decomposition in frozen fish fillets, including frozen Ocean Perch fillets. It is conducted by thawing the hard frozen fillets in cold running water; removing the fillets from the water; weighing and counting the fillets; and then breaking open each fillet and smelling it with the nose closely in contact with the flesh.

The following classifications are utilized both by the Food and Drug Administration and by the fish industry in this test:

*Class 1 fillets*—No odor,[21] or a slight stale odor or a slight fishy odor which is characteristic of the species, but not offensive.

*Class 2 fillets*—A slight but distinct odor of decomposition, which may quickly dissipate on contact with air. The Food and Drug Administration analysts describe this odor as offensive; claimant's analysts describe it as a "gassy" odor, but not offensive.[22]

*Class 3 fillets*—A decidedly strong odor of decomposition. Both the Food and Drug Administration analysts and claimant's analysts describe this order as definitely offensive. They also agree that the difference between the odor of decomposition in a Class 2 fillet and that in a Class 3 fillet is one of degree and not of kind.

Upon all the evidence in this action, in the evaluation of which the Court has been assisted by a demonstration,[23] the Court finds that although the Food and Drug Administration analysts and claimant's analysts tended to use different words to describe the odors identified by them as belonging in each of the foregoing classifications, in fact they were describing the same odors—that is to say, that all of the analysts who testified at the trial would classify almost every fillet with a given odor in the same class.

16. The Food and Drug Administration and the fish industry recognize that a Class 3 fillet is in an advanced state of decomposition, is offensive in smell and in taste, and is unfit for food, and the Court so finds. The Food and Drug Administration and the fish industry are in disagreement as to the state of decomposition of a Class 2 fillet and as to the offensiveness of its smell, but the Court deems it unnecessary, in view of its finding with respect to Class 3 fillets, to make any finding in this respect.

17. Upon all the evidence in this action, including primarily the results of the organoleptic tests hereinabove set forth, which have been evaluated after a consideration of the experience, qualifications and interest of the analysts who conducted them, the Court finds that the lot of frozen fillets here involved contains in excess of 10% Class 2 fillets and approximately 6% Class 3 fillets, which extend throughout the entire lot.

18. The percentage of Class 3 fillets in the lot of frozen fillets here involved is substantially in excess of any administrative tolerance indicated in the record.

19. The results of the chemical tests of selected post-seizure samples conducted by the Food and Drug Administration and by claimant, while tending to correlate with the organoleptic classifications of Class 2 fillets by the Food and Drug Administration, were inconclusive as to the existence or non-existence of Class 3 fillets because of the loss of chemical indices in the preparation of the Food and Drug Administration's samples for testing and because of the limited nature of claimant's tests, and the Court has

21. Although the Food and Drug Administration places a fillet having no odor in a separate Class 0, Class 0 was not utilized by it in this action.

22. Also included in Class 2 are other odors, such as bilge and freezer odors, which are not germane to this action.

23. At the instance of the Court, with the approval of the parties, a demonstration of an organoleptic test by smell was conducted at the close of all the evidence at the Cafeteria at the Portland High School. Two analysts who had testified at the trial, one designated by each party, smelled and classified approximately 200 fillets from the lots here involved. Since the fillets were not representative samples of the fillets seized, the demonstration was for the sole purpose of assisting the Court in understanding and evaluating the evidence by observing how often the two analysts would place a given fillet in the same class, and by permitting the Court to observe and smell a few representative fillets. Of the 204 fillets examined, the Government's expert placed 25 in Class 2 and none in Class 3; the claimant's expert placed 27 in Class 2 and none in Class 3. There was no substantial disagreement between them.

therefore not taken these chemical tests into account in making the foregoing findings.

### Conclusions of Law

1. This Court has jurisdiction of this action and of the parties hereto.

2. The lot of frozen Ocean Perch fillets involved in this action constitutes an article of food within the meaning of 21 U.S.C.A. § 334(a). A. O. Andersen & Co. v. United States, 9 Cir., 1922, 284 F. 542; United States v. 43½ Gross Rubber Prophylactics, D.C.D.Minn.1946, 65 F.Supp. 534, affirmed *sub nom.* Gellman v. United States, 8 Cir., 1947, 159 F.2d 881; United States v. 935 Cases, etc., D.C.N.D.Ohio 1946, 65 F.Supp. 503, 504.

3. A Class 3 Ocean Perch fillet is a decomposed substance within the meaning of 21 U.S.C.A. § 342(a) (3).

4. The lot of frozen Ocean Perch fillets involved in this action was adulterated when introduced into or while in interstate commerce, or while held for sale after shipment in interstate commerce, within the meaning of 21 U.S.C.A. § 342(a) (3) because it consisted in part of a decomposed substance by reason of the presence therein of approximately 6% Class 3 fillets. Compare United States v. 1851 Cartons, etc., 10 Cir., 1945, 146 F.2d 760.

5. The lot of frozen Ocean Perch fillets involved in this action is liable to seizure and condemnation by the United States of America pursuant to 21 U.S.C.A. § 334(a).

6. Because of the presence in the lot of frozen Ocean Perch fillets involved in this action of approximately 6% Class 3 fillets, it is unnecessary for the Court to consider: (1) whether 21 U.S.C.A. § 342(a) (3) admits of a *de minimis* exception, see United States v. 233 Tins, etc., W.D.Ark.1959, 175 F.Supp. 694, 702; (2) whether 21 U.S.C.A. § 342(a) (3) permits the Court to recognize an administrative tolerance of less than 6% Class 3 fillets, see United States v. 1500 Cases, etc., 7 Cir., 1956, 236 F.2d 208; (3) whether a Class 2 fillet is a decomposed substance within the meaning of 21 U.S. C.A. § 342(a) (3) or whether the presence of Class 2 fillets is otherwise significant under that section; or (4) whether a food product which consists wholly or in part of a decomposed substance, but which is not unfit for food, is adulterated within the meaning of 21 U.S.C.A. § 342(a) (3), see United States v. 1500 Cases, etc., supra; United States v. 449 Cases, etc., 2 Cir., 1954, 212 F.2d 567, 45 A.L.R.2d 846 (majority and dissenting opinions).

The Court will render its final judgment in this action in a separate written decree of condemnation and forfeiture, which is to be prepared by the Government, approved as to form by the claimant, and submitted to the Court for its approval and signature within ten days from this date. After entry of the decree, the claimant may have the benefit of the provisions of 21 U.S.C.A. § 334 (d) if it so desires.